IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| BOBBY WAYNE EDGAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:22-CV-620-KFP |
| | ) | |
| MARION B. BRUNSON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants' Motion to Dismiss (Doc. 30) filed in response to Plaintiff Bobby Wayne Edgar's Amended Complaint (Doc. 26). Upon consideration of the motion, Edgar's response (Doc. 36), and Defendants' reply (Doc. 39), the Court ORDERS that the motion be GRANTED and that the case be DISMISSED.

## I.    PROCEDURAL HISTORY

Edgar filed his Complaint (Doc. 1) on October 18, 2022. When Defendants moved to dismiss, Edgar requested and was granted leave to amend. Docs. 21, 25. Edgar's Amended Complaint (Doc. 26) seeks damages against officers with the City of Elba Police Department who are identified as Marion B. Brunson, Justin A. Spence, Anthony Tew, and seven fictitious defendants. He also names the City of Elba as a defendant. *Id.*

Edgar asserts several federal claims under 42 U.S.C. § 1983. He claims Defendants Brunson, Spence, and Tew deprived him of his Fourth and Fourteenth Amendment rights in conjunction with his arrest (Counts I–II) and that these Defendants denied him medical

care (Count IV).[1] Edgar also asserts a state-law claim against these Defendants for assault and battery (Count III). Against Defendant Brunson and several fictitious parties, Edgar alleges a state-law wantonness claim (Count VII). The remaining Counts V and VI are state-law claims asserted solely against fictitious parties. Although the City of Elba is identified as a defendant in the case caption, no claims are asserted against it.[2]

Defendants have moved to dismiss all of Edgar's claims (Doc. 30) and attached the following exhibits to their supporting memorandum (Doc. 31): the police report (Doc. 31-1); Officer Brunson's first body-camera video from June 22, 2021 (Doc. 31-2); Officer Brunson's second body-camera video from June 22 (Doc. 31-3); and Officer Brunson's body-camera video from a previous encounter with Edgar on June 16 (Doc. 31-4).[3] To complete the briefing before the Court, Edgar submitted a brief in opposition to the motion (Doc. 36), and Defendants filed a reply brief (Doc. 39).

## II.    JURISDICTION AND VENUE

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Edgar alleges claims under 42 U.S.C. § 1983. Personal jurisdiction is uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

---

[1] Edgar also asserts this claim against some of the fictitious defendants.

[2] While no claims have been asserted against the City of Elba, Defendants' motion seeks dismissal of any claim against the City based on municipal immunity. Edgar did not respond to this part of the motion. Because the Court finds no claim has been asserted against the City, no finding on the applicability of municipal immunity is warranted, and the City must be dismissed as a party.

[3] Defendants also attached as Exhibit 5 the taser activity download from June 22, 2021. Doc. 31-5. Defendants subsequently withdrew the taser activity download. Doc. 39 at 2. Accordingly, this exhibit is not before the Court.

### III.    STANDARD OF REVIEW

When evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must take the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *Resnick v. AvMed,* Inc., 693 F.3d 1317, 1321–22 (11th Cir. 2012). To survive Rule 12(b)(6) scrutiny, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Under Rule 8 of the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and each factual allegation should be "simple, concise, and direct." Fed. R. Civ. P. 8(a)(2) & (d)(1). To "'state a claim to relief that is plausible on its face[,]'" a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 570). With this in mind, the Court accepts Plaintiff's factual allegations as true and construes the Complaint in his favor. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

## IV.    INCORPORATED EVIDENCE

Edgar concedes that the two body-camera videos from June 22, 2021, are properly considered by the Court, as they are incorporated in the Amended Complaint. Doc. 36 at 12. Accordingly, the Court accepts Edgar's concession and considers these exhibits.

Edgar argues that Defendants' remaining exhibits—the police report and Officer Brunson's body-camera footage from June 16, 2021—are not properly incorporated in his claims and, therefore, cannot be considered on a motion to dismiss. Doc. 36 at 10. Edgar is correct that the district court is generally limited to the four corners of a plaintiff's complaint when reviewing a motion to dismiss, but a court "may also consider those 'documents incorporated into the complaint by reference[] and matters of which a court may take judicial notice.'" *Quinette v. Reed*, 805 F. App'x 696, 700 (11th Cir. 2020) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). "A document or thing is incorporated by reference into a complaint where (1) it is central to the plaintiff's claim, (2) its contents were alleged in the complaint, and (3) no party questions those contents." *Id*. "When a document considered at the motion to dismiss stage contains ambiguities . . . subject to interpretation, courts should interpret all ambiguities in the plaintiff's favor." *Edwards v. Dothan City Sch.*, 82 F.4th 1306, 1311 (11th Cir. 2023) (internal quotations omitted).

Here, the Court finds that all three of these elements are met with respect to the police report. First, it is central to Edgar's claims. He mentions the police report twice in his pleading: first when he asserts the contusion he suffered is noted in the police report and again when he uses this fact to demonstrate Brunson's knowledge of this injury (Doc.

26 ¶¶ 79, 84), which he must prove on his denial-of-medical-care claim. Second, the contents of the report (the fact that the contusion was noted) are alleged in the Amended Complaint. Third, neither party challenges the authenticity of the police report.[4] Thus, in this particular context, the police report is incorporated into the Amended Complaint by reference, and the Court may consider its contents at this stage of litigation.[5]

With respect to Officer Brunson's body-camera footage from June 16, the Court finds that the first of the required three elements, that the footage is central to Edgar's claims, is not met. Although Edgar mentions the June 16 encounter throughout his Amended Complaint to illustrate that Brunson previously met Edgar and was aware he suffered from ataxia (Doc. 26 ¶¶ 13–18), it is not central to Edgar's claims because he does not rely on the June 16 video to prove any of his claims. Accordingly, it is not incorporated by reference in the Amended Complaint. Thus, the Court considers only Brunson's police report (Doc. 31-1) and Brunson's June 22 body-camera videos (Docs. 31-2 and 31-3) in its determination of Defendants' motion.[6]

## V.    FACTUAL BACKGROUND

On June 16, 2021, the Elba Police Department received calls from citizens expressing concern for Edgar's welfare because he was seen walking unsteadily on the

---

[4] Defendants note that the report also records Edgar's staggering in the road when law enforcement arrived, which corresponds with the Amended Complaint's allegations that Edgar was "in the street" at that time.

[5] Edgar does not challenge the police report as containing false information. Additionally, Edgar uses the police report in his argument in opposition to the Motion to Dismiss. Doc. 36 at 27.

[6] Edgar also challenges the declaration of Officer Brunson, which is attached to the Motion to Dismiss. The declaration, however, simply affirms the authenticity of the body-camera exhibits and the police report. The authenticity of these exhibits is not disputed; thus, the Court need not consider the declaration, and the challenge to it is moot.

street. Doc. 26 ¶¶ 13–14. In response, Brunson drove to Edgar, who was sitting on the corner of Court Avenue and Buford Street. *Id*. ¶ 13. Edgar explained to Brunson that he had a neurological disease called ataxia and had three missing toes, which "made it difficult for him to walk normally." *Id*. at ¶¶ 17–18. Brunson assisted Edgar by driving him to his destination. *Id*. at ¶ 18.

Six days later on June 22, Defendants Brunson, Spence, Tew, and accompanying Elba police officers and medics responded to a call for assistance on Cedar Lane, where they found Edgar in the street wrapped in a blanket. *Id*. at ¶¶ 19–22. Edgar alleges he told the officers he "needed help because he was extremely sick," "thought he had COVID-19," and "wanted to go to the hospital." *Id*. at ¶¶ 23–24. He further alleges that he changed his mind and wanted to go home instead, but Defendants informed him he did not have a choice and had to go to the hospital. *Id*. at ¶¶ 24–26. Edgar told Defendants "many times throughout the encounter" that he had ataxia and that it "negatively affected his balance and ability to speak clearly." *Id*. ¶ 28. Edgar contends Brunson was aware of his disease and its effects because of their June 16 interaction. *Id*. ¶ 31.

At the beginning of their encounter, as shown on Brunson's first June 22 video,[7] Brunson tells Edgar to "come here." Ex. 2 at 00:00–05.[8] Edgar refuses, utters some

---

[7] A Rule 12(b)(6) motion generally requires a court to review the facts alleged in the plaintiff's complaint in the light most favorable to the plaintiff. However, when video evidence is properly before a court pursuant to the incorporation-by-reference doctrine and contradicts some or all of the factual allegations from the complaint, the court may consider the video at the motion to dismiss stage. *See Quinette*, 805 F. App'x at 703 (holding under incorporation-by-reference doctrine court may consider video footage of jail cell that captured altercation alleged in plaintiff's complaint and that "the video overrides the complaint").

[8] The videos filed in support of Defendant's motion were conventionally filed with the Clerk of the Court. The first video from June 22 is filed as Exhibit 2 to Doc. 31, and the second video from June 22 is filed as

incoherent statements, and walks away. *Id*. at 00:00–00:09. Brunson then tells Edgar to sit on a nearby front porch where residents of the home were standing just outside their adjacent front door. Doc. 26 ¶ 34; Ex. 2 at 00:09–00:10. At first Edgar refuses. *Id*. at 00:10–00:16. Brunson asks Edgar again if he will go over to the resident's house and tells Edgar to let them take him to the hospital to make sure he is not sick. Edgar eventually complies by sitting on the steps of the front porch while speaking incoherently to the residents. *Id*. at 00:16–00:37.

As Edgar sits on the porch steps, Brunson gives Edgar three options: he can go to the hospital, go home, or go to jail. *Id*. at 00:37–00:51. Brunson informs Edgar that he cannot stay on the residents' porch because they do not want him there, he is not allowed to keep wandering around the streets, and he must decide where he wants to go. *Id*. at 00:51–01:00. In the Amended Complaint, Edgar claims he was "completely lucid" and speaking normally during this exchange and that the residents of the porch had not indicated he was unwelcome on their property. Doc. 26 ¶¶ 35–38. The video, however, contradicts this. It shows Edgar speaking incoherently. Ex. 2 at 00:00–01:00. After Brunson instructed Edgar that he could not remain on the porch and that one of his options was to go to jail, one of the residents said, "He can go his [expletive] to jail." *Id*. at 01:00–01:04. There is no suggestion from the residents that he is welcome to remain on the porch.

Edgar goes on to plead that, in the next sequence of events, he stands up from the porch, leaves that property, walks through another resident's yard, falls toward another

---

Exhibit 3 to Doc. 31. In citing to the videos in this Order, the Court will refer to them as Exhibit 2 (the first video) and Exhibit 3 (the second video).

house, walks through a second yard, continues across a dirt road, and eventually falls in the grass yard on the side of the road where he remains. Doc. 26 ¶¶ 39–47. The video depicts Edgar walking through the neighborhood over residential property, stumbling, tripping, falling on the ground, slurring his words, acting erratically, and generally not complying with the officer's directives. Ex. 2 at 01:00–2:41. The video shows Brunson continually attempting to convince Edgar to go to the hospital, a fact Edgar includes in the Amended Complaint.[9] Doc. 36 ¶ 58. After Edgar falls on the side of the road, he tells Brunson he was "raised with" a disease (ataxia). Ex. 2 at 02:41–02:56. Brunson reassures Edgar that the officers were not going to hurt him. *Id*. at 02:56–02:58. Edgar, who is panting, claims he is going to have a heart attack. *Id*. at 02:58–03:00. Brunson radios a request that the ambulance reposition to the area where Edgar is sitting and tells Edgar he must go to the hospital. *Id*. at 03:01–03:15. Brunson hypothesizes Edgar may be having a panic attack and urges Edgar to let the medics do their job. *Id*. at 03:20–03:26.

The remainder of the video captures similar interactions. Edgar continues refusing help and uttering incoherent statements. Brunson continues urging him to allow the medics to examine him while also reassuring him that no one will hurt him. When Edgar again replies "no," Brunson tells him he is delirious. Edgar continues his incoherent statements,

---

[9] Edgar's Amended Complaint contains contradicting allegations about his need for medical care. He says he initially told officers he needed to go to the hospital but changed his mind and wanted to go home. Doc. 26 ¶¶ 24, 25, 131. He claims the officers then told him he had to go to the hospital (*id*. ¶ 32) and that Brunson continued trying to convince him to go (*id*. ¶ 58). He admits he refused to go to the hospital (*id*. ¶ 119); however, he alleges Defendants "failed to provide him with any medical treatment whatsoever" (*id*. ¶¶ 140, 145) and were deliberately indifferent to his health and safety (*id*. ¶ 144).

and Brunson again informs him that he must go to the hospital because he is delirious and possibly having a panic attack. *Id*. at 05:10–05:40.

Brunson then offers Edgar the choice of going home or to the hospital. *Id*. at 05:47–06:02. Edgar continues to respond with indiscernible statements, including something about his mother. *Id*. at 06:22–06:05. Brunson suggests Edgar call his mother from the hospital, but Edgar persists in his refusal to go. *Id*. at 06:17–06:20. When Brunson again tells Edgar that he cannot stay where he is, Edgar says he is going home to Kinston. *Id*. at 06:20–06:29. Brunson advises Edgar he cannot walk to Kinston in his condition. *Id*. at 06:29–06:34. Eventually, Edgar demands Brunson take him home. *Id*. at 07:28–07:35. Brunson explains that he cannot drive Edgar to Kinston but offers to take him to his sister's house nearby. *Id*. at 07:36–7:50. Edgar engages further in a mostly incomprehensible discussion with Brunson and then yells and throws his blanket over his head. *Id*. at 10:01–10:27.

While Edgar remains seated on the grass, another officer approaches him, tells him to stand up, and attempts to help him up. *Id*. at 10:28–10:40; Doc. 26 ¶ 59.[10] Brunson tries to put Edgar's hands behind his back, causing Edgar to fall forward. *Id*. ¶¶ 59–63. When Edgar tries to walk away, and an officer grabs him and brings him to the ground while a third officer joins in holding him down. Ex. 2 at 10:44–10:51. Three officers surround Edgar[11] and attempt to hold him still to handcuff him. *Id*. One officer yells to another officer

---

[10] Edgar acknowledges that Officer Spence is the individual who orders Edgar to stand up. *See* Doc. 36 at 29; *see also* Doc. 31 at 15–16.

[11] There appears to be no dispute or contrary allegation in the Amended Complaint that the three officers are Brunson, Tew, and Spence.

to deploy his taser, and Edgar is tased at least four times. Doc. 26 ¶¶ 66–67. During the administration of the taser, the officers tell him to stop resisting and to put his hands behind his back, but Edgar continues to move around, crawl away, and refuse to put his right hand behind his back to be handcuffed. Ex. 2 at 10:51–12:31. Edgar is placed in a police car and taken to jail. Doc. 26 ¶ 77.

During the events surrounding his arrest, Edgar suffers a contusion to his nose, which was noted on the police report. *Id*. ¶ 79; Doc. 31-1 at 4. Although the precise timing is unclear from the allegations of the Amended Complaint, also at some point—whether as he stumbled and fell while walking through the residential area, during his encounters with the arresting officers, transporting officers, or jail staff, or while in the jail waiting for his release—Edgar fractures his ankle. Doc. 26 ¶¶ 82, 104.

Edgar asserts in the Amended Complaint that he asked for medical aid while being transported to the jail but was denied. *Id*. ¶ 83. On his third day in jail, a nurse saw him, gave him ibuprofen, and told him he would be fine in a day. *Id*. ¶¶ 98–99. Edgar was released on his fifth day of confinement in jail. *Id*. at ¶ 101. He went to the emergency room and was diagnosed with an ankle fracture. *Id*. at ¶ 104.

## VI.   DISCUSSION

Defendants moved to dismiss the entirety of Edgar's Amended Complaint for failure to state a claim under Rule 12(b)(6). Because the Court concludes Edgar cannot proceed against the fictitious parties, those claims must be dismissed. Edgar's federal causes of action against the named Defendants fail to state a claim on which relief may be granted.

Therefore, those claims cannot survive Defendant's motion to dismiss, and the Court declines to exercise supplemental jurisdiction over his state claims.

### A.    Fictitious Parties

In addition to his claims against the named Defendants, Edgar asserts the deliberate indifference § 1983 claim (Count IV) against fictitious parties Does 1–3 and three state-law claims, negligent correctional care (Count V), medical negligence (Count VI), and wantonness (Count VII), against multiple fictitious defendants. Edgar's state-law claims against the fictitious parties are not clear. Count V is titled "42 U.S.C. § 1983 NEGLIGENT CORRECTIONAL CARE-AGAINST DOES 4 AND 5." While it is labeled as a § 1983 claim, the label appears to be a scrivener's error, as Edgar pleads this claim as a "cause of action . . . asserted against Does 4-6[] pursuant to the Alabama common law tort of negligence as modified by statutes of the Alabama Legislature." He asserts noncompliance with Alabama Code §§ 14-6-1 and 14-6-19 as the basis for the alleged negligent care. Doc. 26 ¶¶ 151–160. Additionally, while the count is titled against Does 4 and 5, and he pleads it against Does 4–6. Edgar also includes allegations that Does 1–3 "negligently, carelessly, and/or unskillfully assessed Edgar." Id. ¶ 158. For this state-law claim, he seeks judgment for this state-law claim only against Does 4–5. *Id*. at 18–19.

Count VI is similarly lacking clarity. It is titled "MEDICAL NEGLIGENCE – AGAINST DOE 4 AND 5," and the allegations under the title relate to the fictitious parties identified as Does 4 and 5; however, Edgar adds other conclusory allegations within this count regarding Does 6 and 7. *Id*. at 19–20. He also includes a legal conclusion that "[e]ach of the foregoing acts and patterns of negligence on the part of Defendant Doe 4, operating

separately or in combination with other Defendants jointly and cumulatively, proximately contributed to cause Edgar's injuries and damages." Doc. 26 ¶ 171. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (stating "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). The absence of clarity in the fictitious party claims notwithstanding, the claims cannot proceed here.

Generally, "fictitious-party pleading is not permitted in federal court." *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010). The Eleventh Circuit "has never permitted John Doe pleading solely on the ground that discovery might reveal an unnamed defendant's identity. Instead, our precedent has always required an unambiguous description of a defendant that enables service of process." *Vielma v. Gruler*, 808 F. App'x 872, 880 (11th Cir. 2020) (citing *Dean v. Barber*, 951 F.2d 1210, 1215–16 & n.6 (11th Cir. 1992)). "[T]he highly generic (e.g., 'a male detective,' 'one of the officers at the hospital,' or 'an FBI Agent') to the ever-so-slightly less generic (e.g., '[a] female white officer about 5 feet 10–11 inches in height' or 'a middle-aged white male [officer]')" are insufficient descriptions because they "fail[ ] to describe the [Doe] defendants with enough specificity to enable service of process." *Id.*; *see also Beaty v. Dunn*, No. 2:20-CV-279-ECM, 2022 WL 1721249, at *5 (M.D. Ala. May 27, 2022) ("In this case, Beaty has identified categories of unknown officers, and has pleaded that they were on duty. This identification does not rise to the level of specificity identified by the Eleventh Circuit."); *Daniel v. Howell*, No. 2:20-CV-145-WKW, 2020 WL 7029152, at *2 (M.D. Ala. Nov. 30, 2020) (dismissing the fictitious party claims and holding that plaintiffs' labels of fictitious defendants as "officers

1, 2, and 3" were ambiguous and lacked necessary specificity to qualify under the limited exception outlined in *Dean*, 951 F.2d 1210).

The Eleventh Circuit has recognized a narrow exception permitting fictitious pleading and allowing discovery where

> the plaintiff's description of the fictitious defendant [is] specific enough to be considered surplusage, at the minimum. *Dean v. Barber*, 951 F.2d 1210, 1215–16 (11th Cir. 1992). The exception is meant to encompass instances when, for "one reason or another, the plaintiff is unwilling or unable to use a party's real name." *Taylor v. Brooks*, 2020 WL 3129862 (N.D. Ala. 2020) (quoting *Dean*, 951 F.2d [at] 1215).

*Huffman v. Dunn*, No. 4:20-CV-1293-CLM, 2021 WL 2533024, at *9 (N.D. Ala. June 21, 2021). Judge Maze succinctly summarized the exception this way: "The cases discussing the exception seem to turn on whether the description of the fictitious defendant (a) allows the reader to point to a specific individual or (b) leaves the reader wondering which person(s) out of a group fits the bill. The former is allowed; the latter is not." *Id*. (comparing *Dean*, 951 F.2d at 1215 (holding that plaintiff's pleading of "Chief Deputy of the Jefferson County Jail John Doe" was sufficient because it pointed to knowable, singular defendant) with *Richardson*, 598 F.3d at 738 (holding that plaintiff's identification of defendant as "John Doe (Unknown Legal Name), Guard, Charlotte Correctional Institute" was insufficient in identifying defendant "among the many guards employed [there]")). Thus, where a plaintiff's descriptions leave the reader "unable to identify the particular individual described," it will fall outside the narrow exception for fictitious party pleading. *Huffman*, 2021 WL 2533024, at *9 (holding insufficient to fall within the exception plaintiff's descriptions of two groups: "each of the Defendants Unknown Shift Commanders, was a

shift commander on duty in the L/M and P/Q Blacks at the St. Clair Prison on the date of
Mr. Pettiway's murder on September 2, 2018" and "Defendants Unknown Correctional
Officers were correctional officers at the St. Clair Prison at the time of the events at issue
[and] were responsible for supervision and monitoring Pettiway's housing unit and the
areas where these events took place"). While not binding precedent on this Court, the
summary of the Eleventh Circuit's exception to the general prohibition is instructive, and
this Court agrees with it.

Before amending his Complaint, Edgar, who is represented by counsel, had the
opportunity to investigate the identity of the fictitious parties, including review of
Defendants' body-camera footage. Nonetheless, the Amended Complaint fails to remedy
the vague descriptions of these parties.

For example, Edgar describes Does 1–3 as "officers with the Coffee County
Sheriff's Office, who assisted with the transfer of Edgar from Officer Brunson's patrol car
into the Coffee County Jail." Doc. 26 at ¶ 8. He states that these unnamed officers "had
direct interaction with Edgar as he arrived" at the Coffee County Jail, but he omits any
description of the alleged "direct interaction" that might help narrow the scope of the
individuals he targets. At some unspecified time over the course of his five-day stay in jail,
Edgar "complained about his injuries at the jail to Does 1–3." *Id* at ¶¶ 8, 92. He "constantly
asked Does 1–3 when the nurse" would arrive to treat him. *Id*. at ¶ 95. Edgar was seen by
a nurse on day three, but it is unclear if he interacted with these same officers as he was
moved inside the jail or in the days before he saw the nurse. Because he does not further
articulate the nature of his interaction or when it occurred, there is no basis to narrow the

group of officers who may have encountered Edgar while he was confined. The Amended Complaint leaves the reader wondering which persons out of a group Edgar intends to name.

Within Edgar's opposition to the motion to dismiss (Doc. 36 at 24), he requests leave to conduct limited discovery. His proposed discovery highlights the generalized and insufficiently specific allegations. He seeks to identify "all officers with the Coffee County Sheriff's Office[] who assisted with the transfer of [Edgar] from Officer Brunson's patrol car into the Coffee County Jail, who were working on June 21, 2021,[12] and had direct interaction with Edgar as he arrived at the Coffee County Jail."[13] *Id.* Edgar's descriptions leave uncertain which officers he intends to include in his Amended Complaint or what "direct interaction" is at issue. It further leaves uncertain the question of whether this group of officers interacted with him at all during the course of his confinement or only "as he arrived" at the jail.[14] Without sufficient details to identify the individual parties or to properly serve them, these fictitious parties are due to be dismissed, and discovery, even if made properly by a motion, would not be appropriate.

---

[12] Edgar's arrest occurred on June 22, 2021.

[13] For each officer identified, Edgar also seeks to request by interrogatory the individual's job title and the "reason for their interaction" with Edgar. Doc. 26 at 24. If Edgar is uncertain of the reason for the interaction and cannot describe it, it is difficult to discern how it could form the basis of a claim against the fictitious party.

[14] The vague assertions also suggest that, even if Edgar were able to identify these fictitious parties, he would have difficulty articulating sufficient factual allegations to state a claim against them. *See McDermont v. Brevard County Sheriff's Office*, No. 6:07-CV-150-ORL-31KR, 2007 WL 948430, at *3 (M.D. Fla. Mar. 27, 2007) (quoting *Gillespie v Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980) (stating that "plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds")).

Edgar's pleading provides slightly more specificity with respect to Doe 4, whom he describes as a nurse, "a female medical provider assigned to work in the Coffee County Jail" with "dark hair" who, "at all material times," was "wearing blue scrubs and a gray sweater." *Id*. ¶¶ 9, 155. Edgar alleges that Doe 4 "encountered Edgar in the jail" at some unidentified time when "he had a contusion and difficulty walking." *Id*. ¶ 93. Edgar alleges "she made no effort to treat Edgar's obvious injuries" or "respond to the requests for medical treatment . . . other than ibuprofen." *Id*. ¶ 93–94 According to Edgar, Doe 4 did not see him until his third day in jail. *Id*. ¶ 155. It is not entirely clear if the day three encounter with Doe 4 is the same encounter described in Paragraph 93 above. Edgar was in jail a total of five days. *Id*. ¶ 157.

The pleading ambiguity as to Doe 4 is exacerbated by Edgar's description of Doe 5. At the beginning of the Amended Complaint, Quality Correctional Health Care (QCHC) is identified as "the company providing medical care for inmates at the Coffee County Jail and [that] employs Doe 4." Doc. 26 ¶ 10. QCHC is not identified by name in any other part of the Amended Complaint—there are no other factual allegations about QCHC and not a single count asserts a claim against QCHC. Near the end of the Complaint, Doe 5 is described as "Doe 4's employer." *Id*. ¶ 164. Thus, it is unclear whether Doe 5 is QCHC or if Doe 5 is a different entity whose identity is unknown. This confusion in describing the entity, in conjunction with the lacking clarity of his "encounter[s]" with Doe 4 leaves in question key details that might enable identification of and service upon these parties.

As with the unknown officers, Edgar requests leave to serve discovery regarding Doe 4 within the body of his opposition brief; however, the embedded discovery request

again underscores the confusion regarding the allegations against Doe 4, and the requests reveal that a group of providers, not a singular nurse, may be at issue. In the proposed discovery, Edgar seeks to identify "*all female medical providers* assigned to work in the Coffee County Jail[] who had direct contact with [Edgar] on June 21, 2021 *or* who are pictured in the attached photo."[15] Doc. 36 at 24 (emphasis added). The uncertainty about the fictitious party nurse or medical providers' identity is compounded because Edgar's proposed request seeks names of those who encountered him on *June 21, 2021*. According to the Amended Complaint's allegations, the arrest occurred on June 22, 2021, and Edgar did not see Doe 4 until his third day in jail, which would have been June 24, 2021. The connection between this fictitious party, Edgar, and June 21 is clear as mud. Even if the Doe 4 nurse and her employer could be identified through discovery, as described below, the Court declines to exercise its supplemental jurisdiction over the state-law claims. Thus, the Court should not allow fictitious party discovery to prolong this litigation where all federal claims are dismissed.

Finally, the Court must reach the same conclusion for Does 6 and 7. The pleading with respect to these parties is replete with ambiguity. Edgar pleads that the state-law negligent correctional care claim in Count V is "asserted against Does 4–6." Doc. 26 ¶ 151. However, Doe 6 is never mentioned in a single factual allegation of the pleading. The only other reference to Doe 6 is in a legal conclusion stating, "Does 6 and 7 negligently breached [a] duty by: (a) failing to timely diagnose and treat Edgar's medical condition; (b) ordering

---

[15]Edgar provides no explanation for how the referenced photo may narrow the scope or identity of the fictitious party, and it is not mentioned in the Amended Complaint.

insufficient medical care for Edgar; (c) ordering inappropriate medical treatment for Edgar; and (d) failing to timely and appropriately have Edgar tested, diagnosed, and treated, at a hospital or other appropriate facility." *Id.* ¶ 167. This legal conclusion is also the only mention of Doe 7. Thus, Does 6 and 7 are included in the Amended Complaint with no factual description whatsoever. *Id.* ¶¶ 151, 167.

Given this, the Amended Complaint does not sufficiently identify the fictitious parties, and Edgar improperly requests discovery within his brief in opposition to the Motion to Dismiss.[16] Without question, Edgar's fictitious party pleading violates the Eleventh Circuit's general rule prohibiting this practice in federal court. The parties he describes could be any number of officers or medical providers on duty over the course of several days who may have interacted with Edgar to some degree, were involved in some nondescript part of his transfer to the Coffee County Jail, or were present at some point in or outside the Coffee County Jail "as he arrived" or after his confinement began.

Edgar's fictitious party pleading falls outside of the narrow exception described above because a singular defendant cannot be identified by any of Plaintiff's category descriptions in the Amended Complaint. Edgar has described an inconspicuous group of officers, medical providers, and employer. *See Moulds v. Bullard*, 345 F. App'x 387, 390 (11th Cir. 2009) (affirming district court's dismissal of plaintiff's fictitious party pleadings because plaintiff failed to describe John Doe defendants in amended complaint completely or with general descriptions and without timely requests "that would have allowed him to

---

[16] In any event, the Court declines to exercise jurisdiction over the state-law claims given dismissal of the federal law claims discussed *infra*.

learn their names and serve process on them"); *Bozeman v. Cnty. of Elmore*, No. 2:20-CV-640-ECM, 2021 WL 2954004, at *3 (M.D. Ala. July 14, 2021) (dismissing plaintiff's fictitious party claims and holding that plaintiff's identification of fictitious defendants as '"whether singular or plural, those employees of Elmore County Jail who were on duty on the occasion made the basis of this suit'" failed to "rise to the level of specificity identified by the Eleventh Circuit"). Because Edgar has not met his burden of describing the Doe defendants with sufficient specificity, even after the opportunity to amend, the fictitious parties are DISMISSED without prejudice.

### B.    Qualified Immunity

Qualified immunity offers complete protection from civil damages for government officials sued in their individual capacities if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Eleventh Circuit has established a two-step analysis to determine whether qualified immunity applies. *See Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983) (citations omitted). First, the defendant government official must show he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). The burden then shifts to the plaintiff to demonstrate (1) the defendant violated a constitutional right (2) that is clearly established. *Zeigler*, 716 F.2d at 849; *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004). "The test is conjunctive, and if a plaintiff fails either prong of the qualified immunity analysis, his claim is barred." *Edger v. McCabe*, 84 F.4th 1230, 1235 (11th Cir.

2023). If a plaintiff cannot establish both elements, the defendant is entitled to qualified immunity, and the court may analyze the elements "in whatever order is deemed most appropriate for the case." *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010), *aff'd*, 566 U.S. 356 (2012) (citing *Pearson v. Callahan*, 555 U.S. 223, 241–42 (2009)).

### 1. Scope of Defendants' Discretionary Authority

As outlined above, for a qualified immunity defense to apply, a defendant must first establish that he was acting within the scope of his discretionary authority. *Melton v. Abston*, 841 F.3d 1207, 1221 (11th Cir. 2016). This inquiry requires a high-level, general evaluation of "whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Hughes v. Locure*, No. 3:22-CV-312-RAH, 2023 WL 2457367, at *6 (M.D. Ala. Mar. 10, 2023) (internal quotations and citation omitted). Courts making this determination disregard the alleged unlawful act and instead consider "whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Mikko v. City of Atlanta, Georgia*, 857 F.3d 1136, 1144 (11th Cir. 2017) (internal quotation marks and citations omitted).

The parties agree that Defendants Brunson, Spence, and Tew were acting as police "officer[s] with the Elba Police Department and [were] acting under the color of law," (Docs. 26 ¶¶ 5–7; 31 at 35–36), but Edgar argues that Defendants went beyond the scope of their authority because they arrested him without probable cause. However, arrest duties fall squarely within an officer's discretionary authority. "A police officer generally acts within the scope of his discretionary authority when making an arrest." *McDowell v.*

*Gonzalez*, 820 F. App'x 989, 991 (11th Cir. 2020). Thus, by arguing Defendants "went beyond their discretionary authority" because they lacked probable cause, Edgar improperly characterizes the legal standard for establishing whether a governmental official can make this discretionary function showing. Because it is undisputed that Defendants were acting as police officers when they arrested Edgar, they have demonstrated that they acted within the scope of their discretionary authority with respect to the alleged conduct. Accordingly, the burden shifts to Edgar to establish they are not entitled to qualified immunity by demonstrating they violated a clearly established constitutional right.

### 2. Alleged Constitutional Violations

#### a. Fourth Amendment False Arrest Claim

One of Edgar's alleged constitutional violations is a Fourth Amendment unlawful arrest claim. He argues Defendants lacked probable cause to arrest him because he had committed no crimes at the time of his arrest. Doc. 26 ¶¶ 128–132. Defendants contend they had actual, or at least arguable, probable cause to arrest Edgar because they reasonably believed based on their observations that Edgar committed at least eight crimes.[17] Doc. 31 at 46.

---

[17] Officers Brunson, Spence, and Tew assert that probable cause existed to arrest Edgar for "(1) pedestrian on a roadway, (2) failure to obey a police officer, (3) public intoxication, (4) pedestrian under the influence, (5) criminal trespass in the third degree, (6) disorderly conduct—unreasonable noise, (7) disorderly conduct—fighting or tumultuous behavior, and (8) resisting arrest." Doc. 31 at 46. In fact, Defendant Brunson states several times on video that one of the reasons for Edgar's arrest is public intoxication. Ex. 3 at 0:57–1:05, 7:26–7:42, 7:51–8:00, and 17:27–17:47. Additionally, although not material to the Court's determination, this video evidence conflicts with Plaintiff's allegation that he was arrested because he would not go to the hospital.

To determine whether probable cause existed for an arrest or whether qualified immunity prevents liability for a false arrest claim, courts apply the *Wesby* test. *See Garcia v. Casey*, 75 F.4th 1176, 1179 (11th Cir. 2023). Under *Wesby*, to "determine whether an officer had probable cause for an arrest, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *D.C. v. Wesby*, 583 U.S. 48, 51 (2018) (internal quotations and citation omitted).

"An officer violates a person's Fourth Amendment right against unreasonable seizures if the officer arrests that person without probable cause to make the arrest." *Garcia*, 75 F.4th at 1186. "Probable cause to arrest exists when the totality of the facts and circumstances support[s] a reasonable belief that the suspect had committed or was committing a crime." *United States v. Lindsey,* 482 F.3d 1285, 1291 (11th Cir. 2007) (internal quotation omitted). "An officer need not have actual probable cause, but only arguable probable cause." *Garcia*, 75 F.4th at 1179 (citation and internal quotation omitted). An officer has arguable probable cause when "a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests here." *Id*. at 1184 (citing *Wesby*, 583 U.S. at 50).

As mentioned above, Defendants assert a reasonable officer in their position would have believed probable cause existed to arrest Edgar for eight different crimes. Although Edgar bears the burden of showing Defendants lacked arguable probable cause to arrest him, instead of addressing each ground, he pivots and offers a proposed explanation for the

arrest: his refusal to go to the hospital. Doc. 36 at 27 n.2. This argument fails to negate probable cause for the arrest.[18]

One of the crimes Defendants point to is public intoxication. Edgar claims the officers knew or should have known he was not intoxicated because he told them he had ataxia, which "affected his ability to walk and speak," and "was extremely sick and needed to go to the hospital . . . ." Doc. 26 ¶ 31. However, under Alabama law, "[a] person commits the crime of public intoxication if he appears in a public place under the influence of alcohol, narcotics or other drug to the degree that he endangers himself or another person or property, or by boisterous and offensive conduct annoys another person in his vicinity." Ala. Code § 13A-11-10(a) (1975). Here, Defendants collectively had sufficient facts to establish actual probable cause for public intoxication. According to Edgar's alleged facts, which are credited at this stage, Defendants responded to a call for assistance from a resident of Cedar Lane Drive who reported seeing Edgar walking unsteadily on the street, and, upon arrival, observed Edgar in the street wrapped in a blanket. Doc. 26 ¶¶ 19–22. And the video depicts Edgar stumbling, falling over, speaking in an incoherent manner while entering three separate private properties, and shouting some indiscernible words and throwing his blanket over his head upon his final fall before the officers attempted to handcuff him.

---

[18] The argument also contradicts other allegations Edgar has made. Indeed, he alleges that *he asked* the officers to take him to the hospital several times before his arrest, but the video depicts Edgar *refusing* to go in the ambulance during the entire encounter leading up to his arrest.

Edgar admits ataxia "causes difficulty with walking, balancing, hand coordination and speech that looks similar to intoxication." Doc. 26 ¶ 30. Thus, when Defendants observed Edgar engaging in this conduct, such as falling over and slurring his words, it could reasonably look like intoxication.[19] Even if Edgar only appeared intoxicated because of his ataxia, Defendants had probable cause to arrest him. Officers are not required to "to rule out a suspect's innocent explanation for suspicious facts" like a sickness or disease.[20] *Garcia*, 75 F.4th at 1190 (quoting *Wesby*, 583 U.S. at 61). "It is not unusual to find at the scene of a crime evidence pointing in different directions, but a law enforcement officer is not required to resolve every inconsistency found in the evidence." *Davis v. City of Apopka*, 78 F.4th 1326, 1335 (11th Cir. 2023) (citation and internal quotation omitted). Defendants reasonably could have believed Edgar was committing the crime of public intoxication because "he appear[ed] in a public place under the influence . . . to the degree [of] [] endanger[ing] himself" when he was unable to stand up without falling over near the street. Ala. Code § 13A-11-10(a) (1975). Accordingly, Defendants Brunson, Spence, and Tew had probable cause to arrest Edgar for public intoxication, which is sufficient to defeat Edgar's false arrest claim.

---

[19] Indeed, Edgar quotes one of the arresting officers who testified at his criminal trial stating that "he 'knew what meth-heads looked like' in referring to why he thought Edgar was intoxicated." Doc. 26 ¶ 105.

[20] Edgar also argues that Brunson acknowledged he had no probable because he is heard on the body-camera video reporting that "'[Edgar] resisted transport, ambulance was on site, refused transport twice, became aggressive so now he's here.'" Doc. 36 at 28. For the same reasons noted above, Brunson's statement does not rule out that a reasonable officer would have believed probable cause existed to arrest Edgar for public intoxication. First, it is an objective analysis—a reasonable officer is the measure. A particular officer's subjective knowledge does not carry the analysis. Second, Brunson's belief that Edgar should have gone to the hospital does not negate probable cause for an arrest on public intoxication. This statement, like Edgar's ataxia, does not rule out a reasonable basis based on the circumstances that there was probable cause for a public intoxication arrest.

Because the Court concludes that Defendants Brunson, Spence, and Tew had probable cause to arrest Edgar for at least one unlawful act,  Defendants did not violate Edgar's Fourth Amendment rights, and the Court need not address whether the right is clearly established. Thus, Defendants are entitled to qualified immunity, and Edgar's false arrest claim is DISMISSED with prejudice.

### b. Excessive Force Claim

Although Edgar asserts an excessive force claim under 42 U.S.C. § 1983 against Brunson, Spencer, and Tew (Doc. 26 ¶¶ 108–123), he fails to make clear whether the claim is based on a violation of his Fourth or Fourteenth Amendment rights. The claim is titled, "42 U.S.C. § 1983 – Excessive Force Against Brunson, Spence, and Tew – Fourth Amendment," but the allegations within Count I confusingly assert that the alleged acts violated Edgar's equal protection rights under the Fourteenth Amendment, not the Fourth Amendment. Doc. 26 at ¶ 122. Defendants argue this claim is, therefore, an equal protection claim, and, because Edgar fails to allege the officers acted with a discriminatory purpose, it fails to articulate a constitutional violation, thereby entitling Defendants to qualified immunity.

Edgar's excessive force claim cannot move forward for two reasons. First, Edgar fails to respond specifically to Defendants' arguments in favor of dismissing the excessive force claim as asserted under the equal protection clause. "Courts in the Eleventh Circuit and beyond have held that the failure of a party to respond or oppose a pending motion may constitute an abandonment of the claims at issue in that motion." *Kirkland v. Cnty. Comm'n of Elmore Cnty., Alabama*, No. 2:08-CV-86-MEF, 2009 WL 596538, at *2 (M.D.

Ala. Mar. 6, 2009); *see Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (holding "appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned"). Edgar has asserted no basis for an equal protection claim, and his failure to address Defendants' arguments is an abandonment of the excessive force claim.

Second, even if the claim were not subject to dismissal because it was abandoned, it could not move forward. Edgar briefly argues in response to the motion to dismiss that any force used during an arrest lacking probable cause is excessive and violates clearly established constitutional rights. Doc. 36 at 37–38. Edgar argues the officers could not use force to make him go to the hospital or any other location (including jail) because they had no probable cause for an arrest. Defendants correctly point out that Edgar's argument is based on the erroneous premise that the arrest was excessive *because* there was no probable cause. This is not the law. "When . . . an excessive force claim is predicated solely on allegations the arresting officer lacked the power to make an arrest, the excessive force claim is entirely derivative of, and is subsumed within, the unlawful arrest claim." *Khoury v. Miami-Dade Cnty. Sch. Bd*., 4 F.4th 1118, 1130 (11th Cir. 2021) (citation and internal quotation omitted). Thus, Edgar's excessive force claim, even if analyzed under the Fourth Amendment, is subsumed within his false arrest claim. Because the Court has found there

was probable cause to arrest Edgar and dismisses the false arrest claim, the excessive force claim based on a lack-of-probable-cause argument must also be dismissed.[21]

Accordingly, Edgar's excessive force claim is DISMISSED with prejudice.

### c. Denial-of-Medical-Care Claim

Edgar asserts a denial-of-medical-care claim under 42 U.S.C. § 1983 against Defendants Brunson, Spencer, and Tew.[22] Doc. 26 ¶¶ 138–149. "[T]he Fourteenth Amendment Due Process Clause, not the Eighth Amendment prohibition on cruel and unusual punishment, governs pretrial detainees like [Edgar]." [23] *Goebert v. Lee Cnty.,* 510 F.3d 1312, 1326 (11th Cir. 2007). The legal standards applicable to a deliberate-indifference claim "under the Fourteenth Amendment are identical to those under the Eighth." *Goebert*, 510 F.3d at 1326. The Court reviews Edgar's denial-of-medical-care claim as a deliberate-indifference claim under the Fourteenth Amendment.

"To show that a [police officer] acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). To prove a deliberate-indifference claim, a detainee must first establish "'an objectively serious medical need'—that is, 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay

---

[21] In passing, Edgar also argues that "in a case similar to this one [the Eleventh Circuit] held that officers used excessive force when they repeatedly tased a citizen while there was no immediate danger to the officer." Doc. 36 at 30–31 (citing *Oliver v. Fiorino*, 586 F.3d 898, 906 (11th Cir. 2009).  However, he again focuses this argument on the officers' giving Edgar the "choices" of going to jail or to the hospital without a basis for doing so. He fails to develop any excessive force claim independent of the false arrest claim.

[22] Edgar also asserts this claim against Does 1–3, which were dismissed above.

[23] Edgar argues this claim under the Fourteenth Amendment in his brief. *See* Doc. 36 at 38.

person would easily recognize the necessity for a doctor's attention'—that, 'if left unattended, poses a substantial risk of serious harm.'" *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020) (quoting *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004)). "For example, we have concluded that a freely bleeding cut that created a pool of blood on the ground and required stitches presented a serious medical need." *Hinson v. Bias*, 927 F.3d 1103, 1122 (11th Cir. 2019) (citing *Aldridge v. Montgomery*, 753 F.2d 970, 972–73 (11th Cir. 1985) (per curiam)). The Eleventh Circuit has "also found broken bones to constitute a serious medical need." *Id.* (citing *Brown v. Hughes*, 894 F.2d 1533, 1538–39 (11th Cir. 1990) (per curiam)). "And depending on the circumstances, severe pain that is not promptly or adequately treated can present a serious medical need." *Id.* (citing *Hinson*, 927 F.3d at 1122). After establishing the objective component, a plaintiff must then establish the subjective component by showing: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Goebert*, 510 F.3d at 1327 (citation omitted).[24]

Edgar claims that Defendants Brunson, Spence, and Tew knew he had serious medical needs, including that he was tased four times, was "extremely sick," suffered a contusion, and had an injury to his ankle or foot. Doc. 26 ¶¶ 104, 139–140. He further

---

[24] There is uncertainty in the Eleventh Circuit whether the standard is "more than mere negligence" or "more than gross negligence." *Johnson v. Lewis*, 83 F.4th 1319 n.2 (11th Cir. 2023) (comparing *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999), with *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010)); *see Brooks v. Miller*, 78 F.4th 1267, 1284 (11th Cir. 2023) ("As of the time we issue this opinion, arguably, some uncertainty exists in our precedent as to whether the standard is 'more than mere negligence' or 'more than gross negligence.'"). As discussed below, Edgar's claim fails under the first parts of the applicable test; therefore, the Court need not consider whether "the officer[s]'conduct amounted to more than negligence of a specified degree." *Brooks*, 78 F.4th at 1284.

asserts that, despite Defendants' awareness of these serious medical needs, they failed to provide him medical services or treatment and that their deliberate indifference caused injury. *Id*. Defendants contend that Edgar cannot show he suffered any injuries constituting an objectively serious medical need and that he failed to plausibly demonstrate they knew a serious risk of harm existed.

### i.  Tasing Injury and Illness

Edgar fails to establish that being tased four times or being extremely sick qualifies as a serious medical need. "To proceed on a claim challenging the constitutionality of medical/mental health care '[t]he facts alleged must do more than contend medical malpractice, misdiagnosis, accidents, [or] poor exercise of medical judgment.'" *Gladney v. Burks*, No. 2:18-CV-442-WKW, 2021 WL 3179023, at *7 (M.D. Ala. June 29, 2021), *report and recommendation adopted*, No. 2:18-CV-442-WKW, 2021 WL 3177408 (M.D. Ala. July 27, 2021) (quoting *Daniels v. Williams*, 474 U.S. 327, 330–33 (1986)).

First, Edgar asserts no specific injury caused by the tasing or what he believed to be COVID-19. Even if Edgar did assert an injury from the taser, such as a taser burn, our precedent "has found that a plaintiff complaining of minor burns and associated scarring failed to state a claim for deliberate indifference." *Roebling v. City of Tuscaloosa, Alabama*, No. 7:14-CV-151-SGC, 2015 WL 7433147, at *5 (N.D. Ala. Oct. 30, 2015), *report and recommendation adopted*, No. 7:14-CV-151-RDP, 2015 WL 7424120 (N.D. Ala. Nov. 23, 2015) (citing *Hayward v. Kile*, No. CIV.A CV607-68, 2009 WL 2045925, at *8 (S.D. Ga. June 12, 2009) (granting defendant's motion for summary judgment and finding ulcer caused by taser burn was not an "objectively serious medical need"), *report*

*and recommendation adopted,* 2009 WL 2045923 (S.D. Ga. July 13, 2009)). Thus, the fact that Edgar was tased does not amount to a serious medical need on the facts the Court must accept as true. Further, while courts have deemed an illness coupled with severe symptoms as a serious medical need, Edgar's conclusory statement that "he was extremely sick" and "thought he had COVID-19" does not plausibly establish an objectively serious medical need. For example, in *McElligott v. Foley*, 182 F.3d 1248, 1256 (11th Cir. 1999), the court held that an inmate's cancer diagnosis constituted a serious medical need and that the defendants were aware of that need because the plaintiff continuously complained about severe pain and was visibly deteriorating and losing weight. On the other hand, the court has found that skin abrasions and bruises (*see Hinson*, 927 F.3d at 1122) and a temporary bloody nose and mouth, complaints of pain, and disorientation did not constitute serious medical needs (*see Fernandez v. Metro Dade Police Dep't*, 397 F. App'x 507, 512 (11th Cir. 2010)). Edgar does not allege that he endured any injury from the taser or that being sick with COVID-19 caused any symptoms or posed a substantial risk of serious harm.

Second, assuming Edgar could show a serious medical need related to the tasing or COVID-19 and Defendants' subjective knowledge of the risk of serious harm, the facts negate a finding that Defendants disregarded the risk of medical need. Defendants summoned an ambulance, and Edgar refused medical treatment and transport. Further, as Edgar concedes, after telling Defendants he was sick and believed he had COVID-19, he retracted his request to go to the hospital. Doc. 26 ¶¶ 23–25. An officer disregards a risk of serious harm when he is aware of a serious medical need but refuses or denies medical care or "turn[s] a blind eye." *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1272 (11th

Cir. 2020). The presence of the ambulance and medics at the scene of Edgar's arrest, coupled with his refusal to enter the ambulance and receive medical attention, weigh against his denial-of-medical-care claim. Additionally, the fact that Defendants "questioned him repeatedly regarding his desire for treatment demonstrates not deliberate indifference, but significant concern about his condition." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000). Thus, Edgar's denial-of-medical-care claim with respect to his being tased and his sickness is DISMISSED with prejudice.

### ii. Ankle or Foot Injury

Edgar alleges that at some unidentified time "during the encounter" made the subject of the lawsuit, he suffered an ankle fracture. Doc. 26 ¶ 82. The Amended Complaint's allegations regarding the ankle fracture leave it unclear when the injury occurred, who was aware of it, when they became aware of it, and to whom he complained. Plaintiff asserts the following about the ankle injury, which must be taken as true on consideration of the motion to dismiss:

> 82.    Edgar also suffered an ankle fracture during the encounter.
>
> 83.    Edgar told the officers of his injury and asked for medical treatment for the injury.
>
> 94.    Nor did Doe 4, ever respond to the requests for medical treatment Edgar made, instead allowing him to endure the pain of his broken ankle and contusion with no treatment for the injuries other than ibuprofen.
>
> 104.   After release, Edgar went to the emergency room, where his injury was finally diagnosed as an ankle fracture.

139.   Defendants Brunson, Spence, Tew, and Does 1–3 knew that Edgar had been tased four times, that he was extremely sick, and that he had suffered other injuries including a contusion and an injury to his foot.

143.   Once Plaintiff suffered an ankle fracture, his need for medical care and the Defendants' knowledge of that need only became more obvious.

152.   Does 1–3, knew about his injuries, specifically including his ankle fracture, and his need for medical attention.

157.   Edgar remained with a fractured ankle in confinement in the Coffee County Jail for five days.

165.   Upon looking at Edgar's ankle fracture that had been left to fester for three days, Defendant gave him only ibuprofen and told him it would be fine in a day.

Doc. 26.

While Edgar alleges his need for care "became more obvious" when he suffered the ankle injury (*id*. ¶ 143), he leaves to guesswork when or how the injury actually occurred. Taking his allegations as true, Edgar alleges his ankle injury occurred sometime on the first day, but the details—whether it occurred before or during his arrest, during his transport, as he arrived at the Coffee County Jail, or while confined in the Coffee County Jail the first day—are conspicuously missing from his amended pleading. *See id*. ¶ 165 (injury festered for three days) and ¶ 157 (remained at Coffee County Jail with a fracture for five days). Edgar alleges he was made to endure the pain of a broken ankle during his confinement, which was treated with nothing except ibuprofen, and that for two days no nurse tended to

him, leaving his ankle fracture untreated. Doc. 26 ¶¶ 94, 97. The ankle fracture was not diagnosed until his release when he was seen in an emergency room. Doc. 26 at ¶ 104.

Critically, however, Edgar does not allege that Defendants Brunson, Spence, and Tew caused or were aware that his ankle was fractured; he alleges only that they were aware of "an injury to his foot" and a need for medical care at some unidentified point in time and that he told unidentified "officers"[25] of "his injury and asked for medical treatment." *Id.* at ¶¶ 83, 139, 142. In his brief, Edgar ignores the lack of clarity in the Amended Complaint about the alleged ankle injury and cites back to the now-moot Complaint to support pleading of this claim. Doc. 36 at 39, 42; *see L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323, 1328 (11th Cir. 2020) (quoting *TVPX ARS, Inc. v. Genworth Life & Annuity Ins. Co.*, 959 F.3d 1318, 1327 (11th Cir. 2020) ("Because 'an amended complaint supersedes the former pleadings,' the amended complaint controls which persons are defendants in a lawsuit.")).

A broken ankle or foot could require serious medical attention. *See Brown*, 894 F.2d at 1538–39 (holding that "an unexplained delay of hours in treating a serious injury" like a broken foot "states a prima facie case of deliberate indifference"). Giving Edgar the benefit of an assumption that he meets the objective standard of the applicable test by showing an objectively serious medical need, he still fails to assert a plausible claim against Defendants Brunson, Spence, and Tew. Their knowledge of "an injury to his foot" (Doc. 26 ¶ 139) and

---

[25] This lack of clarity is further compounded by Edgar's description of Does 1–3, whom he describes as "officers" with the County Sheriff's Office, while Defendants Brunson, Spence, and Tew are identified as officers with the Elba Police Department. *See* Doc. 26 ¶¶ 5–8.

that he "needed medical care at the scene of the arrest and at the jail" (*id*. ¶ 142) is insufficient to demonstrate more than a mere possibility they were aware of the serious medical need.

Edgar, too, is uncertain when the injury occurred, making these Defendants' subsequent knowledge of (and reaction to) the injury little more than conjecture. For example, Edgar argues "[t]he officers' assault on Edgar caused him to suffer a contusion to his nose and an ankle fracture." Doc. 36 at 9. He then speculates that "[i]t is *entirely possible* that Edgar's fracture occurred during [the] time when his ankle was between the door and the car frame" while he was being transported. *Id*. at 40 (emphasis added). On one hand, Edgar argues he had no trouble walking; on the other hand, he argues he was "having some trouble walking." *Id*. Edgar's inconsistent arguments highlight the confusion in what he has pleaded in the Amended Complaint as the basis for his medical-deprivation claim.

As noted above, to survive the motion to dismiss, Edgar must assert enough facts to suggest the claim could be established. *See Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (allegations must be more than "merely possible"; only "plausible" claims survive a motion to dismiss). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted). This standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id*. at 678. Conclusory allegations that are merely "conceivable" and fail to

rise "above the speculative level" are insufficient to meet the plausibility standard. *Twombly*, 550 U.S. at 555, 570. Edgar's allegations do not clear the plausibility standard. He fails to assert factual matter, accepted as true, that *these Defendants* had subjective knowledge of a risk of serious harm. Without this, the claim cannot survive the motion to dismiss.

Furthermore, even if Edgar could plausibly show Brunson, Spence, and Tew had subjective knowledge of the risk of serious harm, the factual allegations negate the plausibility that these Defendants disregarded a risk of serious harm at the scene of the arrest. Based on the allegations of the Amended Complaint, Defendants summoned medical providers to the scene of the arrest—they did not "disregard" a risk of serious harm, if it occurred during that encounter. Edgar does not allege that these Elba City police department Defendants were involved in his medical care (or the lack of it) once he was booked into the Coffee County Jail, other than a vague allegation that they were "aware that Edgar needed medical care at the scene of the arrest and at the jail." Doc. 26 ¶¶ 142 and 83 ("Edgar told the officers of his injury and asked for medical treatment for the injury."). With the occurrence of the injury left to speculation, these generalized allegations are insufficient to show more than a vague possibility that these Defendants were aware of a risk of serious harm and disregarded that risk.[26] For this reason, the claim does not raise

---

[26] Defendants Brunson, Spence, and Tew argue that the body-camera footage contradicts any allegation of a serious foot injury. They argue the video shows, among other things, Edgar reporting ataxia was his issue (*i.e.*, not a foot injury) and Edgar walking into the jail bearing weight on both legs. Doc. 39 at 35–40. Edgar argues the video is inconclusive as to the status of his injury while simultaneously arguing that an ankle fracture "would be so obvious" but would "not necessarily affect one's ability to walk." Doc. 36 at 40–41. Because the Amended Complaint ambiguously pleads when the injury occurred and Defendants'

a right to relief above the speculative level. At most, Edgar has asserted that he was harmed, *i.e.*, by suffering an ankle fracture, that some individuals became aware of this harm before it was diagnosed upon his release, and that he was not treated to his satisfaction in the interim. This is not enough to carry the burden of showing entitlement to relief. *See Iqbal*, 556 U.S. at 678 (stating the standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation").

The Court need not reach the question of whether Edgar could establish negligence or gross negligence under the final part of the subjective part of his claim. The failure to assert clear factual allegations as to Defendants' knowledge and disregard fell the claim. While he need not assert detailed factual allegations for every element of the claim, here, there are insufficient facts asserted in the Amended Complaint on which a plausible claim for denial-of-medical-care could be based against *these Defendants*.

Accordingly, Edgar failed to establish a denial-of-medical-care claim in regard to his ankle or foot injury, and the claim is DISMISSED with prejudice.

### iii. Contusion

Finally, the Court addresses Edgar's assertion that he suffered a contusion to his nose at some point during the incident. Doc. 26 ¶ 79. The contusion is visible in the June 22 video and documented in the police report; it appeared on Edgar's nose after Brunson tased him and after the struggle on the ground that ensued while Defendants handcuffed him. *See* Ex. 2. As discussed above, Edgar was seen by a nurse and given ibuprofen. Edgar

---

knowledge of the serious risk, the Court need not resolve what, if anything, the video demonstrates about the existence of the injury.

does not mention any exacerbated or severe pain or prolonged injury. Thus, the contusion did not present a serious medical need. *See Hinson*, 927 F.3d at 1122 (finding that plaintiff experienced skin abrasions on his face a bruise on his knee but, because plaintiff "was not actively bleeding," responded that he was "alright," "never said he was not physically alright, never asked for medical assistance, and never complained he was in pain," did not present a serious medical need).

Based on these facts, Edgar cannot plausibly argue that Defendants failed to offer him medical assistance. Thus, the Court DISMISSES Edgar's denial-of-medical-care claim with prejudice.

### C.    Edgar's remaining state-law claims are dismissed.

This Court has jurisdiction over Edgar's federal question claims. Therefore, the Court has supplemental jurisdiction over the state-law claims. *See* 28 U.S.C. § 1331. As discussed above, all of Edgar's § 1983 claims must be dismissed, leaving only his surviving state-law claims.

The Eleventh Circuit encourages district courts to dismiss any remaining state-law claims when all federal claims are dismissed before trial. *See Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004); *see also Corbitt v. Henry County Comm.,* No. 1:22-CV-693-RAH, 2023 WL 8587257, at *7 (M.D. Ala. Dec. 11, 2023) ("Because the Court has determined that the Defendants' federal claims are due to be dismissed, the Court elects not to exercise jurisdiction over the state law claim.") Accordingly, this Court

refrains from exercising jurisdiction over Edgar's state-law claims, and his assault and battery and wantonness claims are DISMISSED without prejudice.[27]

## VII.   CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss (Doc. 30) is GRANTED. All of Edgar's federal claims are DISMISSED with prejudice. All claims asserted against fictitious parties are DISMISSED. Edgar's state-law claims are DISMISSED without prejudice.

DONE this 3rd day of January, 2024.

/s/ Kelly Fitzgerald Pate
KELLY FITZGERALD PATE
UNITED STATES MAGISTRATE JUDGE

---

[27] "When a court decides not to exercise supplemental jurisdiction under § 1367(c)(3) because only state claims remain, the proper action is a dismissal without prejudice so that the complaining party may pursue the claim in state court." *Ingram v. Sch. Bd. of Miami-Dade Cnty.*, 167 F. App'x 107, 109 (11th Cir. 2006).